Thank you, your honors. It's my pleasure to be in front of you. I want to welcome Judge Giorgia. I actually went to Emory Law School to have a little affinity for Georgia. This is a very important case. It deals with Antifa. It deals with the failure of the University of California at Berkeley, as well as the police department there and the city of Berkeley, to protect people exercising their First Amendment rights, their rights to assembly, and their equal protection rights. Obviously, this has been much in the public's consciousness just in the last few days. And my client, Kiara Robles, should not be treated any differently than anyone else with regard to her rights. She's a young gay woman. She appeared on February 1st, 1917, to simply listen to a speech. 1917? She's really old, isn't she? Sorry, 2017. Oh, okay. I was going to say, you really dated your client. Maybe there's an analogy there to the Bolshevik Revolution. I don't know. That might have gotten to her mind. We are going to be using 21st century law to deal with this case. Thank you, your honor. I appreciate that. I'm also going to reserve five minutes at the end. But the bottom line is this, is that she was unable to actually listen to that speech. She was attacked. She was attacked with bear mace, with pepper spray. She was hit over the head with a sign, a pole. And she was blinded with a flashlight, such that it caused her immediate fear of severe bodily injury and even death at the time. We brought the lawsuit back on August 22nd, 1917. Excuse me, 2017. I'm doing it again. Now, what's important here, and the issues have been well briefed, and I'm here to answer questions. But the Pro Hec Vicee application is very important to understand what happened there. Because this deprived my client of due process. Before you get to that, let me ask you. As I understand it, you didn't submit the 28 U.S.C. 144 affidavit that's required in connection with a recusal disqualification motion. Is that correct? No, we did submit an affidavit, your honor. There were two affidavits, one from Chiara Robles and one from my local counsel, who was Michael Kolosny at the time. It is in the record. Can you tell me where that is in the record, please? It's part of the appendix. I can certainly supplement with that on rebuttal. I can find it for you so we don't have to use it. Would you please? I'll do that. Because if that was not done, I'm wondering whether we have jurisdiction to even consider that, whether that's a waived issue. But if you filed it, then, of course, that's another matter. Well, the denial of Pro Hoc Vitae is even separate from the issue of disqualification. Well, I wanted to ask you about that. Let's assume there's an affidavit in the record, and you file a motion to disqualify a district judge because she was appointed by a Democratic president and went to Berkeley Law School. And you're seeking Pro Hoc Vitae admission in that court. Is the frivolity of that motion something the judge can take into account in determining Pro Hoc Vitae's status? This was a misrepresentation by the city of Berkeley. We never filed a motion disqualifying in the beginning. We filed a voluntary request for recusal. I was concerned because of the highly charged atmosphere at Berkeley and the fact that the police department, as we alleged on orders, was ordered to stand down and not protect my client. Well, I'm asking about the district judge. I'm not asking about what happened in the case. You asked the district judge to step aside because she was appointed by a Democratic president and had attended the University of California at Berkeley. It's hard for me to find any justification for that request. And assuming I'm right, could she take that into account in determining Pro Hoc Vitae's status? No, because here's the point I'm making. I just expressed a concern that it created the appearance that there could be bias in the end. We did not move to disqualify her. But if you allow me to make this particular point, Pro Hoc Vitae was not – please let me finish, Your Honor, in all due respect. My Pro Hoc Vitae was not revoked until a year into the case. I had already been participating in the case. It was because the city of Berkeley raised that issue that this occurred. Now, why is it that I was allowed to participate for a year if, in fact, that issue is relevant to this particular matter? The reason was – That was before a magistrate judge, right? Well, yes, I was admitted by the magistrate, but I actually participated in front of Judge Wilkins for one year before this was removed. One year. And that's extremely important to understand. And also remember this. I've never been suspended for one day from the practice of law by any bar association. There was never any final determination in the District of Columbia of any suspension. It was still under review by the D.C. Court of Appeals. Misrepresentations were made by the city of Berkeley, which were adopted by the judge that, in fact, I had been suspended. There were misrepresentations with regard to the Bundy matter, with regard to what occurred there, because Judge Gould, a very fine judge on your court, said that I hadn't done anything wrong. And then, of course, there was a misrepresentation made that I had moved to disqualify the judge up front. I didn't. I just simply raised a concern, and I think that's a legitimate concern, Your Honor. We live in the real world. You know, even Larry Klayman is influenced, by the way, of my past experience and my thoughts. And I was concerned because we have sued the University of California at Berkeley. I am a conservative. My client is a conservative. It's a very polarized area right out there. And we had a situation where Antifa had attacked my client, where, as we alleged in the complaint, the police departments were instructed not to do anything about it. And my client was seriously harmed. So I had a duty to raise that issue. It wasn't intended to be abrasive or in any way disrespectful, and it was done extremely lightly. And, again, ask yourself this question. Why is it, after all this, when I was consistent, when I continued to pursue these claims, and I'm the only lawyer, frankly, who can do it, as those affidavits attest to, which I'll point out, I'm the only lawyer who would step forward. And my local counsel was there only for filings. He didn't have the resources. He was in financial difficulty. And we told the judge that if you remove me and, in effect, remove my local counsel because he can't proceed on his own, the case is over. And that's, in fact, what happened. This is a massive denial of due process rights. It's unjust. And the case is well briefed. You'll see that we spent a lot of time in this case. In the course of that year, the only thing that happened was, inadvertently, we missed a filing deadline by a few days. We moved for leave, non-proton, to file it. But there was nothing that I did that was improper. And when we had an oral argument, I got up and I said to the judge, I said, Your Honor, if I do anything wrong, you have the ability to sanction me. I'm here in good faith. You know, I want to represent my client. I respect you. I respect the court. But you have to allow me to continue in this case. She persisted to make incorrect findings. And if you look at her actual rulings in this case, please look at them carefully. They are so contrived. She's straining to get rid of this case every single which way. Even the issue of the flashlight. She's talking about, well, did it really harm your client? What does the meaning of the word conservative mean? That was the basis for the ruling. The Supreme Court's case says that you can blame extrajudicial bias and prejudice on the basis of rulings, frankly, that don't make any sense. It looked like they're so weighted in one favor of a litigant than the other. So, yes, at the end, we moved to disqualify and to vacate all the orders. And you know what? The judge wound up dismissing the case before she even ruled on the motion. Another example of bias and prejudice. Counsel, may I ask you this? You, of course, can argue your case however you wish. But you spent a good part of your time now talking about the disqualification issue and not about any of the substantive legal points. Is there anything other than the disqualification that you want to focus on? You said you wanted to reserve five minutes. You can do that or not. But I'm just surprised that you're not focusing more on the substance of the issue. Well, the reason was because it's well-briefed, Your Honor, and I wanted to clear this up. So you want us to just rely on the briefs? Yes. Well, the fact is that under 42 U.S.C. and Bivens that we can sue the individual regents and we can sue individuals. Our complaint alleged that there was a stand-down order. It wasn't an unaffirmative act. It was an affirmative act. This case should have even gone to discovery. The Minnell case says that when there's discrimination as a policy and practice to discriminate, it is actionable against the regents. We also cited the Ruin v. City of Miami case, 2007, U.S. District Court, 14931, Southern District of Florida. We don't have to even identify who the police officers were that stood down at this point in time. But this is an important case. We also pled common law claims under assault, battery, and we also set forth the Green Act. Now, we were never able to reach those determinations because the judge took me out of the case before she could even reach those cases, effectively denying my client due process. But we rest on the briefs. They're very detailed. I hope you have an opportunity to read them. We have, and I have a question about your battery claim against the individual defendant. I want you to try to help me on that. What are the facts plausibly alleged as to that individual? Put aside for a second your general allegations about Antifa because I don't see anything in the complaint that links this individual to Antifa. What do you say that she did? Well, number one, your honor, there were allegations linking Dabney Miller and Raha Mirabel to Antifa. Yes, we do. Where are they in your complaint, sir? They're in the complaint several times. Well, no, there are allegations that seem to say that everybody in the crowd who was a counter-protester was a member of Antifa. But I'm trying to find some plausible. It's like calling somebody a Nazi. I'm trying to look for a plausible factual allegation that this woman who did shine a flashlight in your client's face, that's what I'm trying to figure out, was a member of Antifa. Where's the plausible factual allegation that she was a member of Antifa? There were advertisements, and that's in the complaint, too, on San Francisco website of Antifa. But that's another reason, your honor. No, I'm asking, just tell me what the allegations were that linked her to Antifa. As opposed to everybody in the crowd that was on the other side. One of them, based on my recollection, actually bragged that they were a member of Antifa. I can't pronounce her name, and that's why I'm having trouble. Ms. Murabda? Did she? Is there any allegation that she bragged that she was a member of Antifa? I believe that there was, your honor. I'll take a look when they're doing the oral argument. If you could identify where in the complaint that is. Put that aside for a second. I just want to focus on that, because I want to ask her lawyer questions about this, too. Let me make a point here, though. Before I finish, let me finish asking the question, then you can make your point. As I read the complaint, the allegation is that she shone a flashlight in your client's face at a time when several other people surrounded your client and either pepper-sprayed her or maced her. Are those the factual allegations about her? Yes, and there's a case decided, Newman v. San Joaquin, aiders and embedders. In other words, anyone— I understand what the law is. I'm really trying just to find out what the factual allegations are. Are those the factual allegations? Yes, and they're very detailed in the complaint, your honor. I would also refer back to the second amended complaint, which were extremely detailed. The judge dismissed out a number of defendants there, and at the end, he dismissed out the Antifa. She dismissed out, in fact, the Antifa defendants, so it is in there, your honor. But let me just add— But as to Ms. Marabdal, we're looking at the first amended complaint, are we not? Because the second amended complaint was simply to raise the Bain Act issue. No, they're in both complaints. There was a complaint filed at the end of the second amended complaint, and they're both— Thank you, because now I do—that's the second question I wanted to ask you. The second amended complaint was dismissed for failure to respond to it. We couldn't respond to it. Respond to the motion to dismiss. We didn't have any lawyers. Yes? Yes? We didn't have any lawyers. I think this case is one of the most outrageous examples of judicial— I think Judge Smith will give you time to make your jury closing argument. I'm just asking some questions right now. Correct. My question is, the second amended complaint was dismissed because a motion to dismiss was filed, and your side never responded to it, correct? We had no lawyers. Yes is the answer? The answer is yes. Okay. Okay, now— At this point— If the second amended complaint is in front of—is the operative complaint, then isn't the only question in front of us whether the judge abused her discretion in dismissing it because nobody responded to the motion to dismiss? No, because she had already dismissed those defendants with regard to the second— That's why I asked. I asked. It's really the first amended complaint with respect to the battery claim that we're dealing with here, right? Not the second. The first amended complaint had a number of different accounts in it, dealing with 42 SC 1983, dealing with the Bain Act, dealing with the Ralph Act, dealing with a lot of different issues, and the judge dismissed most of those defendants. Okay, so yes, that's at issue, but the second amended complaint is also at issue because we didn't have the opportunity to, in fact, wage our case in front of the court because the judge had knocked out all of our lawyers. That's—so you have to consider both. Judge, can I just ask this question one more time? Sure. I'm just trying to figure out, in your mind, which complaint, the dismissal of which you're appealing from, is in front of us. Is it the second amended or is it the first amended with respect to Ms. Mirabal? It's the second with regard to Ms. Mirabal. It's the second with regard to her and with regard to the other one, Dabney Miller. Yes, it's the second one. Okay, thank you. That's all I was trying to find out. Right. Now, I just want to make one point, and then I'll reserve the rest of my time. You don't have any more time. I'm going to give you a little bit more time because I'll let you ask that question, Dick. Okay. Judge, do you have a question before we— Well, I have some questions, but I can get to him when he comes back. Why don't we do that on his coming back? Let's give the other counsel a chance to argue, and then Mr. Klayman will give you a couple of minutes to respond, okay? Can I take five seconds right now? It should have gone to discovery, okay, for a lot of these questions. Like my colleague Judge Hurwitz said, you'll have a chance to make that argument. Thank you. So, counsel for Appellee, you guys are going to divide in three, right? You've got three different counsel? That's correct. Okay, and you know this never really works very well, but you're welcome to try. So, whoever's going first, please do so, and you have five minutes, and then the next has five minutes, and the next has five minutes. So, please proceed. Thank you. May it please the court, Matthew Warbeck for defendant, City of Berkeley. The First Amendment complaint does not state a Monell claim against the City of Berkeley for three reasons. There's no plausible Monell policy play. Second, there is no duty to act. And third, the City of Berkeley was not the cause of the damages here because its police officers were not in a position to decide anything. It's undisputed. This was a event on the UC campus. UC Berkeley is an arm of the state. It is a separate jurisdiction. Berkeley police officers were merely there to assist. How do we know that from the face of the complaint? This is a 12B6 motion. We know it by inference and by the lack of any allegation otherwise. We know it from Plaintiff's Counsel's three statements in his opening argument that the police were ordered to stand down. That's a quote. Instructed not to do anything. That's a quote. Stand down order. That's a quote. On page... You know, he alleges that there was a stand down order. And you say, well, it doesn't matter because the Berkeley police were only there as observers. And I'm trying to figure out how I can infer that from the well-pleaded allegations in the complaint. Paragraph 75 of the complaint, excerpt from Record 104. Quote. It was, quote, the regents, the regents that intentionally withheld police support of UCPD and BPD because these attendees represented political police that went against, end quote, their own. In addition, page 15 of Plaintiff's reply brief. The individual regents, quote, ordered the police not to act, end quote. In addition, in the opposition to the first motion to dismiss an excerpt of Record 52, Plaintiff suggested that the Berkeley officers followed the directions of UC officials. So there's quite a bit here to indicate, in addition to common sense, that UC is a separate jurisdiction. And Plaintiff has alleged all over the place, including three times in the last minute, that UC ordered the stand down. Now, with respect to no plausible Monell policy play, Monell can only be played in two situations against the city, an official policy. And there's nothing in the complaint here to suggest that Berkeley had an official policy of withholding police support to conservative events. This is a custom and practice case. So what are the elements of custom and practice? Board of County Commissioners of Byron County, well known for elements. The officers violated a person's constitutional rights often. There is no such allegation in this complaint. Need for training, plainly obvious. No such allegation. The city was deliberately indifferent to those violations that occurred often. No such allegation. The city's deliberate indifference was the moving force of the violation. No such allegation and undercut by the discussion we just had as to who gave orders here. The specific pleading standard has changed in that to allege a Monell claim, or a custom claim, under ADXREL Hernandez versus County of Tulare. The specific pleading standard of Iqbal applies to Monell claims. That means unreasonable inferences are not allowed. Speculation is not allowed. Conclusory allegations are not allowed. Rather, plaintiffs must state in their complaints specific facts to support their Monell claim. So the issue here is, what are the specific facts to support their conclusory allegations that the city had a custom and practice of withholding police support to conservative events? I've got 14 seconds left, so I'll do that, okay? Well, let me just say the district court said the First Amendment does not require the government to protect rogues against the actions of others, citing Haitian refugee. Quote, the Constitution does not require the government to assist the holder of a First Amendment constitutional right in the exercise of that right. She also cited de Cheney, which is a no-duty-to-protect-against-violence case. Counsel, you are using your time. Another defendant will pick up Johnson v. Seattle, which is right here. Who's next? Thank you. Thank you. Good morning, Your Honor. May it please the Court. Brian Hacken-Lively with Munker, Tolles & Olsen for defendants Janet Napolitano and Nicholas Dirks. Quite simply, Your Honor, the claims against President Napolitano, the president of the UC system, and Nicholas Dirks, who was formerly the chancellor of UC Berkeley, all failed for multiple reasons, and the district court was correct to dismiss them. And the principal one is the one that my colleague was just addressing with respect to the city, and that's that what's alleged against these university officials is that they failed to provide police protection to the plaintiff and other individuals attending the event. But this court and the Supreme Court have been very clear for a number of years that the government has no duty to prevent private parties from interfering with the constitutional rights of other private parties. And that's what's alleged here. There's a narrow exception to that that the petitioner's attempt, or excuse me, the appellant's attempting to rely on for situations where the state creates the danger by taking affirmative acts. But that's not what's alleged here. Not acting isn't enough, and that makes sense. Otherwise, the university and every other government actor would have the impossible duty to stop any injury or any violation of rights that would have occurred within their jurisdiction any time anything went wrong. And the facts alleged here are very similar to the facts alleged in Johnson v. City of Seattle, a case we talk about at length in our brief. And what the plaintiffs attempted to do there was essentially convert a stand-down order into an affirmative act. They said, well, the city told the police not to intervene, and telling them not to do that was an affirmative act. The panel of Johnson said, no, that's not sufficient. Quote, the decision to switch from a more aggressive operation plan to a more passive one was not affirmative conduct. And that's simply the allegation here. And the attempts to distinguish Johnson in the brief are not persuasive because, in fact, what the plaintiff's saying is that there was actually less affirmative conduct here than there was in Johnson because, as he says in his argument, there was no policing provided at all. That's his allegation. So we'd submit that there's no constitutional violation on the First Amendment claim under this court's analysis in Johnson and the DeShaney standard. And certainly, at a minimum, there'd be no clearly established right to that end for purposes of full protection claim. Your Honors, I think the district court got this one right as well. The allegation here is that the plaintiff was treated differently because she was a woman and because she was gay. But the allegation in this case is that there was no protection for anyone at all at the event. There's no allegation that Plaintiff Robles was treated differently than the other people who were attending the event. In the complaint, I don't recall any allegation that she was treated differently because she was a gay woman. Do I recall correctly? There's a conclusory allegation to that effect in the recitation of the cause of action. But otherwise, no, Your Honor. There's no allegation in the complaint that the policing provided to plaintiff in particular was different than the policing provided to everybody else who was attending the event. And there's not even conclusory allegations that Janet Napolitano or Nicholas Dirks had an animus against women or people who were gay, let alone against Plaintiff Robles in particular. And so because the Equal Protection Claim and the First Amendment Claim under 1983 both fail, the Bain Act Claim fails along with it. And I have one minute left, Your Honor. My last point would simply be that there really are no allegations here of any actions taken by President Napolitano or Chancellor Dirks in their personal capacities. The claim against the Regents of the University of California was dismissed on 11th Amendment and will grounds. Plaintiff got leave to amend, and so she went ahead and substituted in my two clients. But there's really no allegations about anything that they did in their individual capacities separate from what was alleged that the Regents did in the First Amendment Complaint. And I thought it was notable that Mr. Klayman referred to the Regents as the one taking their particular actions here during his argument this morning. Can I ask one quick question? Were the Regents sued individually or only as a body politic? In the original complaint, the Regents were sued as a body, and then that was dismissed on 11th Amendment and will grounds. And then President Napolitano and Chancellor Dirks were substituted in in their individual capacities only in the First Amendment Complaint, and they're not members of the Board of Regents. Not the members of the Board? Correct, Your Honor. Thank you. I have a question. You just said that the Bain Act Claims fail. Why is that? Under the Bain Act, Your Honor, if there's no underlying constitutional violation, which there wouldn't be if the court affirms the dismissal of the Equal Protection and First Amendment Claims, then the Bain Act Claim can't survive. There are other reasons why the Bain Act Claim fails that we lay out in our brief, which I'm also happy to address, Your Honor, one being the Government Code Section 845, Absolute Immunity, under California law for failure to provide a certain level of policing. Well, it doesn't necessarily fail against the individual defendants. Do you agree with that? I agree that it would fail against the two clients that I represent, President Napolitano and Chancellor Dirks, but not necessarily the other individuals who aren't affiliated. Yes, I agree with that. Thank you. Other questions by my colleagues? If not, we thank you for your argument. So now we have the last argument in the appellees representing Mirabdol, I guess is the way you say it, right? Mirabdol. Mirabdol. Okay. Thank you. Yeah. Good morning, Your Honors. Rachel Letterman representing appellee Raha Mirabdol. The allegations against my client are simply that she went to the protest and supposedly shone a flashlight on Ms. Robles. It's not alleged in any of the complaints that she bragged about being a member of a particular group. And there's actually no facts alleged showing that Ms. Mirabdol belonged to any particular organization or plotted with these supposed unknown individuals to attack Ms. Mirabdol. Go ahead, Judge. Excuse me. Go ahead. There's no reason to believe that there was an organized effort out there that night to disrupt the lecture that was supposed to be given and also to disrupt the people who were there to support or to hear that lecture. There's nothing but speculation alleged as to my client as to her role in that. And, in fact, these allegations that there were 1,500 people who were all conspiring together are contradicted by material that's footnoted in appellant's own complaint. She says that she was pepper sprayed, sprayed with bear mace, hit with flags, and, of course, your client allegedly shined a light in her eyes, which blinded her temporarily. Why does that make out a Bain Act claim? So the Bain Act claim was the subject of our third motion to dismiss, which plaintiff did not file opposition to, and that was the only remaining claim against my client. The case against my client was then dismissed because no opposition had been filed. And, actually, Judge Wilkin gave the plaintiff extra time, a month's extra time to get an opposition together. She was represented by a counsel, Mr. Kowalski, who had never withdrawn. And yet, supposedly, he was busy, but he never bothered to even ask for an extension of time to get his opposition in or maybe for an extension of time for Ms. Robles to find substitute counsel. Can I ask a proceeding? You realize that's part of the issue in the case about how that was handled by the district court. And so we don't know at this point how that's going to turn out. I'm trying to understand from you why this wouldn't be a Bain Act claim or why it wouldn't be a battery, according to state law, or an assault. Okay, so in terms of the battery and assault claims, the operative complaint is the first amended complaint because those claims with prejudice on the motion to dismiss the first amended complaint. In that complaint, there's no allegation of any direct harm by my client shining her supposed flashlight. But there is an allegation that your client shines a flashlight in Ms. Robles' eyes while Ms. Robles is surrounded by other people who then spray her and mace her. That's rather plainly alleged. Why doesn't that give rise to a reasonable inference that she was part of that assault, even if the shining itself is not an assault? And adding to that the idea of possible aiding and abetting to the theory of liability. Well, there's really no facts alleged that how the flashlight facilitated the quote-unquote unknown assailants attacking Ms. Robles. And there's certainly no cases stating that shining a light, an ordinary light, is sufficient for battery. But again, back to Judge Hurwitz and my combined question, is there any case law that you can inform us about that says that if you have a group of things happening, the bear mace, the flag, the flashlight, a group of people alleged to be acting together, why would that not be an aiding and abetting of a tort of a battery? Because it's based on pure speculation as to my client's intent under California law, a claim for assault. Isn't that something for a jury to determine? I mean, we're talking about a complaint here, not what the ultimate result would be. Under Iqbal and Twombly, there has to be more than mere conclusions. There has to be plausible facts alleged. With respect, isn't it plausible? Again, I have no idea whether any of this is true, but isn't it plausible that the allegation that there were a number of people around Ms. Robles, somebody had a flag, somebody had the bear mace spray, somebody had the flashlight, allegedly your client, and that in combination, that was a battery on her. Again, I don't know whether it's true or not, but the question is whether this is an allegation that is implausible. Given the facts as alleged, I don't see how that is implausible. Help me with that, please. But the allegations, as you've just stated them, it's a bit more than what the complaint actually says. The complaint just says that there were people surrounding Ms. Robles and that my client shone a flashlight, and then unknown other people did the bear mace and the pepper spray, and then at some other point, somebody hit her with flags. There's just no, other than that they were all in a large crowd together, there's just nothing connecting my client to these, quote-unquote, unknown assailants. We're talking about the first amended complaint in which they're referred to as unknown assailants. There's no further facts like that she ever talked to them, that she was close to them. With respect, your time is up. Let me ask my colleagues, do either of my colleagues have additional questions for counsel? No, I think we've covered my questions. You all covered some that I was going to ask, but I don't have any more. Do you have any more questions, Judge Hurwitz? No. All right, well, thank you, counsel, for your argument on this. So we're going to go back to Mr. Klayman. Mr. Klayman, you've got a couple of minutes to make your argument. Your mute is on. Thank you. I'd like to give you some more information that you had requested. I would turn to, in the amended complaint, paragraph 61 through 64. Which amended complaint, first or second? First. And in that particular case, we do set forth how Mr. Miller boasted about the assaults and battery on my client. Okay, and it was reported in the New York Daily News. He wore a mask, hid his identity, wielded a wooden club. He bragged about it on a social media account that he physically beat Trump supporters. So I wanted to give you that citation. With regard to affidavits, it's just one example. And if I find more, I'll certainly file a letter with the court of supplemental assistance. Document number 87 attaches affidavits. But I would also point out, in addition to 144. Excuse me, counsel, is that the 144 affidavit? At the top of my head, it's hard to go through all these documents. It's a lengthy case, and I'll supplement on that. But I want to point out, I'm not sure. Do you agree that if you did not file such an affidavit, that the issue of disqualification and your own pro hoc vici is really not before us? Well, I don't agree with the pro hoc vici. That is in front of you regardless. But we also, in our briefs, raised 28 U.S.C. 455B, where you don't need an affidavit. In fact, the law tracks each other. And we cited the Lateke case in the United States versus Sybilis. So even if there is no such affidavit, and I'll go back and look, 455 would apply, and you don't need an affidavit for that. And we've set forth all of the different rulings of this court, which were very prejudicial. So doesn't our case law say that you can't establish bias and prejudice because of rulings against you? It must be external to the case? Yes. And in a limited respect, Lateke says, and I'm quoting, that you can show extrajudicial bias and prejudice with, quote, a decree of favoritism or antagonism, which can serve as a basis for such a motion, even when no extrajudicial source is involved. And that's very important here. So back in Lateke, I would look to that case. That's a Supreme Court case that says, when the judge is showing such animus and bias and prejudice, even in the context of the lawsuit, that can rise to the level of a 455B1 disqualification. And that would apply here as well, with or without a specific affidavit. Now, the affidavits that I'm pointing out, that I was able to locate during my esteemed counsel's argument, deal with the fact that Ms. Robles could not get another lawyer. No one wants to take on Antifa. And, you know, I am the kind of lawyer that does those kinds of things. Counsel, with respect, you're now over your time. Let me ask my colleagues, do either of you have additional questions for Mr. Clayman? I'd just like to know how you have a BANAC claim here against the individual defendants, the non-governmental defendants. Well, Your Honor was alluding to it, is that there were threats here that threatened free speech, freedom of assembly. And by the way, there were specific allegations that was incorrect of rediscrimination on the basis of sexual persuasion. Do you have a BANAC claim against Ms. Mirabda? Yes. Why? Doesn't it require somebody being acting under the color of state law? It does not. There can be an individual BANAC claim against someone under California law? No, but we did allege that as well. We allege that, in effect, the Berkeley University Police Department and the City of Berkeley Police were complicit in that. They stood around, you know, watched at it, you know, behind closed doors. They themselves were very secure, and they let all heck being beat out of my client. I was asking about Ms. Mirabda, and I know I've mispronounced her name again, counsel, I apologize. Is there an individual BANAC claim against her, in your view? Yes. And let me point out another thing, another misstatement that was made by counsel for Berkeley. Chancellor Dirks did make disparaging remarks against Milo Yiannopoulos, who was the speaker, called him a troll, a provocateur, etc. That shows, you know, the bias here of Berkeley, okay, of both the university and the regents. You have given us some good pleadings. We appreciate all counsel's pleadings. Unless either of my colleagues have additional questions, we'll thank all of you for your arguments, and the case just argued is submitted. Thank you.
judges: M. Smith, Jr., Hurwitz, Royal